IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J&J SPORTS PRODUCTIONS, INC.<br>    *Plaintiff*<br><br>    v.<br><br>DIMITRIS SPILIADIS a/k/a DIMITRIS SPILADIS TRUSTEE FOR THE SURVIVING ASSETS OF BLUE ZONE HOPITALITY, LLC d/b/a BLACK OLIVE d/b/a THE OLIVE ROOM d/b/a INN @ THE BLACK OLVE-KITCHEN d/b/a BLACK OLIVE AGORA d/b/a OLIVE INN RESTAURANT, *et al.*<br>    *Defendants.* | Civil Action No. ELH-18-2600 |

**MEMORANDUM OPINION**

This case involves alleged violations of federal broadcasting statutes with respect to a boxing match that took place in September 2015.

Plaintiff J&J Sports Productions, Inc. ("J&J" or the "Company"), a commercial distributor of sporting events, filed suit against defendants Dimitris Spiliadis as Trustee for the Surviving Assets of Blue Zone Hospitality, LLC d/b/a Black Olive d/b/a The Olive Room d/b/a Inn @ The Black Olive-Kitchen d/b/a Black Olive Agora d/b/a Olive Inn Restaurant ("Blue Zone"); Olive Grove Catering, Inc. d/b/a Inn at the Black Olive d/b/a The Black Olive d/b/a Olive Inn Restaurant t/a Black Olive ("Olive Grove"); Dimitris Spiliadis; Pauline Spiliadis; and Sotirios Spiliadis. ECF 1 (the "Complaint").[1] The Company maintains that it held the exclusive commercial distribution rights to the nationwide broadcast of the welterweight championship fight between Floyd

---

[1] Because of the common surnames of the individual defendants, and to avoid confusion, I shall refer to the individual defendants by their first names.

Mayweather, Jr. and Andre Berto on September 12, 2015 (the "Program"), and that defendants infringed this right by intercepting and exhibiting the Program without paying the required licensing fee.

The Complaint contains two counts. Count I alleges the unlawful interception and publication of radio communications, in violation of 47 U.S.C. § 605. ECF 1, ¶¶ 16-28. In Count II, plaintiff alleges the unauthorized interception of communications offered over a cable system, in violation of 47 U.S.C. § 553. ECF 1, ¶¶ 29-33. Plaintiff seeks, *inter alia*, statutory penalties, attorneys' fees, and costs.

Now pending is "Plaintiff's Motion for Partial Summary Judgment," pursuant to Fed. R. Civ. P. 56(a). ECF 29. In particular, J&J seeks summary judgment as to liability of defendants under Count I. The motion is supported by a memorandum of law (ECF 29-3) (collectively, the "Motion"), and four exhibits. ECF 29-4 to ECF 29-7. Defendants oppose the Motion (ECF 35) (the "Opposition"), and plaintiff has replied. ECF 36. With leave of court (ECF 41), defendants also filed a surreply (ECF 38), along with seven exhibits. ECF 38-1 to ECF 38-7.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I. Background

### A. Procedural History

The Company filed its Complaint on August 22, 2018 (ECF 1), supported by one exhibit. ECF 1-1. The exhibit contains, *inter alia*, a copy of records of the Maryland Department of Assessments and Taxation for Blue Zone, Black Olive Agora, The Olive Room, Olive Grove Catering, and The Black Olive. *Id.* at 1-10. It also contained Blue Zone's Articles of Organization, *id.* at 16-17, and the liquor license issued to Olive Grove. *Id.* at 19.

Defendants filed an answer (ECF 13), which they later amended. ECF 20. Thereafter, the Court issued a Scheduling Order, setting the discovery deadline for April 11, 2019, and the dispositive pretrial motions deadline for May 8, 2019. ECF 19.

Pursuant to the Scheduling Order, plaintiff filed its Motion on May 8, 2019 (ECF 29), along with four exhibits. ECF 29-3 contains the affidavit of Joseph M. Gagliardi, the president of J&J, and a copy of the licensing agreement executed by Mayweather Promotions and granting J&J exclusive distribution rights to the Program. ECF 29-5 is the affidavit of James Osgood, and ECF 29-6 is the affidavit of Jonathan Martin. ECF 29-7 contains a compilation of discovery documents. These include responses to "Plaintiff's Request For Admissions," addressed to "Dimitris Spiliadis," *id.* at 4-11; "Pauline Spiliadis," *id.* at 13-20; "Stelios Spiliadis," *id.* at 22-29; Dimitris as the trustee of Blue Zone, *id.* at 31-38; and Olive Grove. *Id.* at 40-46. And, ECF 29-6 contains responses to "Plaintiff's First Set of Interrogatories to Defendant," addressed to "Pauline Stelios," *id.* at 49-55, and "Stelios Spiliadis." *Id.* at 57-63.

On May 20, 2019, defendants requested a nine-day extension to file an opposition (ECF 30), which the Court granted the same day. ECF 32. And, on May 28, 2019, defendants requested a second extension of time, seeking to move the deadline to June 15, 2019. ECF 33. Again, the Court granted the motion. ECF 34.

On June 17, 2019—two days after the deadline—defendants filed their three-page Opposition. ECF 35. Plaintiff replied on July 1, 2019. ECF 36. Thereafter, defendants requested leave of Court to file a surreply. ECF 37. The surreply (ECF 38) is supported by seven exhibits, including the affidavit of Dimitris (ECF 38-1) as well as six affidavits describing investigations similar to those performed by Osgood and Martin. ECF 38-2 to ECF 38-7.

3

Plaintiff filed a response objecting to defendants' proposed surreply. ECF 39. By Order of August 9, 2019, the Court granted defendants' motion for leave to file a surreply. ECF 41.

### B. Factual Background

J&J is a California corporation engaged in the business of distributing sports and entertainment content. *See* ECF 1, ¶ 5; ECF 29-4 (Joseph M. Gagliardi Affidavit), ¶ 3. Pursuant to a licensing agreement with Mayweather Promotions, the Company obtained the exclusive rights to exhibit and sublicense the Program, which encompassed the main-event fight between Floyd Mayweather, Jr. and Andre Berto, as well as all preliminary bouts. ECF 29-4, ¶ 3; *see id.* at 10-15 ("Closed Circuit Television License Agreement"). J&J entered into agreements with various Maryland entities, permitting those entities to exhibit the Program to their customers. *Id.* ¶ 8.

To prevent the unauthorized receipt of its programming, J&J distributes its content via closed circuit television and encrypted satellite signal. *Id.* ¶¶ 9-10. In order to view its programming, J&J provides authorized commercial establishments with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or it notifies the establishment's cable or satellite provider to unscramble the receipt of the broadcast. *Id.* ¶ 11. As a result, J&J avers that its programming "is *not* and *cannot* be mistakenly, innocently, or accidentally intercepted." *Id.* ¶ 9 (emphasis in ECF 29-4).

However, J&J acknowledges that there are "several methods by which a signal pirate can unlawfully intercept and broadcast [its] programming." *Id.* ¶ 10. An entity can receive encrypted transmissions by purchasing various devices that, when attached to a cable TV line or satellite dish, unscramble the transmission of pay-per-view broadcasts. *Id.* A commercial establishment may misrepresent itself as a residential property to avail itself of the cheaper licensing fee. *Id.* Or,

the entity may steal the Company's programming by surreptitiously obtaining the broadcast from another viewer who has paid the licensing fee. *Id.*

As noted, defendants include Blue Zone, Olive Grove, and three individuals—Dimitris, Pauline, and Sotirios. ECF 1, ¶¶ 6-8. At the relevant time, Blue Zone was a limited liability company ("LLC") registered in Maryland with its principal place of business at 803 South Caroline Street in Baltimore. ECF 1-1 at 1-2.[2] According to Blue Zone's Articles of Organization, it owned "the Inn at the Black Olive," "the Market," and "the Party Room," all of which were located at 803 South Caroline Street. *Id.* at 16-17. And, according to the Maryland Department of Assessments and Taxation, Blue Zone owned and operated the "Black Olive Agora" and the "Olive Room," both of which were also located at 803 South Caroline Street. *Id.* at 3-4. However, it is not clear which entity was "the Market" and which was the "Party Room."

Olive Grove was, at the relevant time, a Maryland corporation with its principal place of business at 814 South Bond Street in Baltimore. *Id.* at 5.[3] It served as the corporate owner of "The Black Olive," which was located at 814 South Bond Street. *Id.* at 6. Olive Grove held a license from the Board of Liquor License Commissioners for Baltimore City to sell beer, wine, and liquor at 803 South Caroline Street. *Id.* at 19. The license provided that it covered the "FIRST FLOOR AS A MARKET/CAFÉ, SECOND THRU FOURTH FLOOR AS A HOTEL WITH FOUR ROOMS ON EACH FLOOR AND ON THE FIFTH FLOOR USE AS A RESTAURANT." *Id.* (emphasis in original).

---

[2] Although Blue Zone was formed on July 31, 2013, it has since dissolved. *See* ECF 1-1 at 1, 16-17.

[3] Olive Grove was incorporated on October 4, 1994, but it is no longer in good standing in the State of Maryland. ECF 1-1 at 5.

Dimitris was the registered agent of Blue Zone and Olive Grove. *Id.* at 1, 5. Pauline and Sotirios each held a one-third ownership stake in Olive Grove. *See* ECF 29-7 at 50, 58.[4] Further, Dimitris, Pauline, and Sotirios were listed as licensees on Olive Grove's liquor license. *Id.* at 19.

The Program aired on September 12, 2015. ECF 29-4, ¶ 3. According to J&J, "[a]t no point did Defendants or their establishment ever lawfully license the Program[.]" *Id.* ¶ 7.

On the night of the broadcast, the Company sent two investigators to inspect the establishments located at 803 South Caroline Street. *See id.* ¶¶ 6-7; ECF 29-5 (James Osgood Affidavit); ECF 29-6 (Jonathan Martin Affidavit). The first investigator, James Osgood, visited the "Black Olive" at 10:50 p.m. ECF 29-5 at 1. After paying a $25.00 cover charge, Osgood went to fifth floor of the building. *Id.* There, Osgood observed two televisions, both of which were showing an undercard boxing match that was part of the Program. *Id.*; *see also* ECF 29-4, ¶ 7. Osgood counted the number of patrons inside the Black Olive three times, recording approximately one hundred patrons each time. ECF 29-5 at 2. He left the Black Olive at 11:00 p.m. *Id.*

A second investigator, Jonathan Martin, visited the "Olive Inn Restaurant" at 10:40 p.m. ECF 29-6 at 1. Martin paid a $20.00 cover charge and a $4.00 fee for parking in a hotel garage. *Id.* While at the Olive Inn Restaurant, Martin observed one television hanging from the ceiling. *Id.* According to Martin, he saw, *id.*:

> [A]ction . . . between Roman Martinez and Orlando Salido (undercard). There were 10 people inside seated . . . . There was a stereo behind that area, with the fight

---

[4] As discussed, *infra*, the interrogatory contained in ECF 29-7 is addressed to "Stelios Spiliadis" and is signed under that name. *See* ECF 29-7 at 57. Curiously, plaintiff cites to that interrogatory when referring to "Sotirios Spiliadis." *See* ECF 29-3 at 4. However, because defendants do not argue that Stelios and Sotirios are different persons, I assume that "Stelios" and "Sotirios" are the same person.

Assuming that Sotirios and Stelios refer to the same person, it appears that Sotirios is the spouse of Pauline and Dimitris is their son. *See Our History*, THE BLACK OLIVE, https://www.theblackolive.com/ (last visited Jan. 23, 2020).

6

broadcast coming through the speakers . . . . This officer believes that for the main event they were going to transfer the party to the rooftop bar. I was told by the hotel's front desk attendant that there was another party going on during the undercards, and they would be clearing out and they would let the fight party transfer there.

Dimitris, Pauline, and Sotirios acknowledge that the Program was exhibited at the establishments at 803 South Caroline Street. ECF 29-7 at 6, 15, 24. And, they concede that they did not pay the licensing fee to exhibit the Program. *Id.* at 5, 14, 23. Dimitris also admits that he was present at the establishments while the Program was shown. *Id.* at 8.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

7

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). But, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations.

*Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III. Discussion

J&J asserts that it is entitled to summary judgment on the issue of defendants' liability under 47 U.S.C. § 605 for satellite-signal piracy. *See* ECF 29-3 at 7, 14. According to the Company, Blue Zone and Olive Grove failed to respond to requests for admission and therefore have admitted to unlawfully intercepting the Program. *Id.* at 8-10. The individual defendants are also liable, J&J argues, because there is no dispute that the Program was exhibited at their establishments, they had supervisory authority over the establishments, and they had a strong financial interest in the exhibition of the Program. *See id.* 12. In response, defendants contend that summary judgment is inappropriate because plaintiff's submissions "are rife with contradictions, apparent misrepresentations and apparent fraud." ECF 35 at 2.

### A. Signal Piracy

Plaintiff's claims are governed by the Federal Communications Act of 1934 (the "Communications Act"). Pub. L. No. 73-416, 48 Stat. 1064 (1934) (codified at 47 U.S.C. § 151 *et seq.*). Although the Communications Act was initially intended to regulate the field of radio communication, Congress amended the statute in the 1980s and 1990s to address "a problem which [wa]s increasingly plaguing the cable industry—the theft of cable service." H.R. Rep. No. 98-934,

9

at 83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720. The unauthorized interception of television programming, Congress concluded, "pose[d] a major threat to the economic viability of cable operators and cable programmers, and create[d] unfair burden on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it." *Id.*

To that end, Congress added § 553 to Title 47. In particular, 47 U.S.C. § 553(a)(1) states: "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Congress granted a private right of action to "[a]ny person aggrieved by any violation of subsection (a)(1)." *Id.* § 553(c)(1). And, Congress provided a range of criminal and civil remedies for violations of § 553, including actual damages suffered by the plaintiff and statutory damages not less than $250 and not more than $10,000, "as the Court considers just." *Id.* § 553(c)(3)(A).

Further, Congress amended and supplemented § 605 of Title 47 to address "the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations." 1984 U.S.C.C.A.N. at 4745. Section 605 provides, in relevant part: "No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). In turn, § 605(e) provides for private civil enforcement of § 605(a) and articulates criminal and civil penalties for its violation. *See id.* § 605(e).

A plaintiff cannot, however, double dip. Therefore, a plaintiff cannot recover damages under both §§ 553 and 605. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (noting

10

that "'courts can and should preclude double recovery by an individual'") (citation omitted); *accord J&J Sports Prods., Inc. v. Bromart, LLC*, DKC 15-0175, 2015 WL 8138091, at *2 n.2 (D. Md. Dec. 8, 2015); *J&J Sports Prods., Inc. v. Shiva Foods, Inc.*, PWG-14-2049, 2015 WL 2452421, at *2 (D. Md. May 19, 2015).

Moreover, there appears to be a split of authority as to whether § 605 covers cable piracy in addition to satellite piracy. *See J&J Sports Prods., Inc. v. Brady*, 672 F. App'x 798, 800 n.2 (10th Cir. 2016) (canvassing the split); *Bromart*, 2015 WL 8138091, at *2 (acknowledging the split among courts in this District). The majority view is that §§ 553 and 605 are "mutually exclusive," and § 605 covers only the interception of satellite transmissions. *Brady*, 672 F. App'x at 800 n.2. Conversely, the minority view is that intercepting a cable communication violates § 605 as well as § 553. *Id.* To my knowledge, the Fourth Circuit has not yet addressed the issue. But, I need not wade into this debate, because plaintiff seeks summary judgment only as to its § 605 claim with respect to satellite piracy. *See* ECF 29-3 at 7.

Notably, § 605 is a strict liability provision. *See J&J Sports Prods., Inc. v. Beer 4U, Inc.*, TDC-18-2602, 2019 WL 5864499, at *3 (D. Md. Nov. 8, 2019); *Bromart*, 2015 WL 8138091, at *2. Therefore, to establish a violation of § 605, a plaintiff "need show only that it had the exclusive commercial distribution rights to the [program] and that [the defendant] exhibited the [program] without authorization." *Beer 4U*, 2019 WL 5864499, at *3; *see also Brady*, 672 F. App'x at 800 ("To establish liability [under § 605], a plaintiff must show: (1) interception of a satellite transmission; (2) lack of authorization; and (3) publication to any person.").

### B. Corporate Defendants

The Company has amply demonstrated that there is no genuine issue of material fact that Blue Zone and Olive Grove violated 47 U.S.C. § 605. As an initial matter, J&J has established

that it had the right to exclusive nationwide commercial distribution of the Program, as reflected in the licensing agreement between J&J and the fight promoter. ECF 29-4 at 10-15. Defendants have offered no evidence to rebut that contention. To establish that Blue Zone and Olive Grove unlawfully intercepted and exhibited the Program, the Company relies on the corporate defendants' failure to respond to plaintiff's requests for admissions. ECF 29-3 at 8; *see* ECF 29-7 at 30-47 (Request for Admissions).

Under Rule 36(a) of the Federal Rules of Civil Procedure, "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." To be sure, there is a "strong policy" in the Fourth Circuit "that cases be decided on their merits." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993). But, the Fourth Circuit has also recognized that "'Rule 36 admissions are *conclusive* for purposes of the litigation and are sufficient to support summary judgment.'" *Adventis, Inc. v. Consol. Prop. Holdings, Inc*., 124 F. App'x 169, 173 (4th Cir. 2005) (emphasis in *Adventis*) (quoting *Langer v. Monarch Life Ins. Co*., 966 F.2d 786, 803 (3d Cir. 1992)); *accord La Michoacana Nat., LLC v. Maestre*, 3:17-cv-00727-RJC-DCK, 2019 WL 2403106, at *1 * n.2 (W.D.N.C. June 6, 2019) ("'Courts within the Fourth Circuit have consistently held that admissions, including unanswered requests for admissions, may provide a sufficient factual basis to support a motion for summary judgment.'") (citation omitted).

By failing to respond to the Company's request for admissions, Blue Zone and Olive Grove are deemed to have admitted (quoting ECF 29-7 at 32-33, 41-42):

- **REQUEST FOR ADMISSION #2:** Neither YOU nor anyone else ordered the EVENT for the ESTABLISHMENT from Plaintiff.

- **REQUEST FOR ADMISSION #4:** Neither YOU nor anyone else paid a licensing fee for the EVENT for the ESTABLISHMENT to Plaintiff.

- **REQUEST FOR ADMISSION #6:** Neither YOU nor anyone else ordered the EVENT for the ESTABLISHMENT from any other authorized party with the intention of paying Plaintiff for the telecast of the EVENT.

- **REQUEST FOR ADMISSION #7:** YOU intercepted the broadcast of the EVENT.

- **REQUEST FOR ADMISSION #10:** The EVENT was shown in the ESTABLISHMENT on September 12, 205.

Therefore, J&J has shown that Blue Zone and Olive Grove exhibited the Program without authorization, in violation of § 605. *See Joe Hand Promotions, Inc. v. SNP Hookah Lounge & Grill LLC*, 4:18-01666, 2019 WL 3500854, at *3 (S.D. Tex. July 31, 2019) (granting summary judgment on plaintiff's § 605 claim where defendants defaulted on admissions under Rule 36); *J&J Sports Prods, Inc. v. Mumford*, DKC-10-2967, 2012 WL 1409588, at *4 (D. Md. Apr. 20, 2012) (same).

But, the Company has provided evidence separate and apart from the admissions. Blue Zone was the registered owner of two establishments located at 803 South Caroline Street. ECF 1-1 at 3-4. And, Olive Grove was the corporation listed on the liquor license for the market/café and restaurant located at that address. *Id.* at 19. Further, there is no genuine dispute of material fact that establishments at 803 South Caroline Street exhibited the Program without authorization. In their affidavits, J&J's investigators reported that they observed the Program being exhibited at the Black Olive and the Olive Inn Restaurant on September 12, 2015. *See* ECF 29-5; ECF 29-6. But, plaintiff avers that "[a]t no point did Defendants or their establishment ever lawfully license the Program[.]" ECF 29-4, ¶ 7. Crucially, Dimitris, the registered agent of Blue Zone and Olive Grove, admits that he did not purchase a license to show the Program, but that it was nonetheless exhibited at establishments located at 803 South Caroline Street. ECF 29-7 at 5-6.

Despite this mountain of evidence, defendants contend that summary judgment must be rejected, highlighting "contradictions, apparent misrepresentations, and apparent fraud" in the Company's submissions. ECF 35 at 2; *see also* ECF 38 at 2. Defendants point to contradictions between the accounts provided by Osgood and Martin. ECF 35 at 2. Specifically, Osgood stated in his Affidavit that he paid a $25 cover charge and made no mention of a parking garage. However, Martin stated in his Affidavit that the cover was $20 and that there was a parking garage. *Id.* at 2. Further, defendants aver that it is "impossible" that Osgood and Martin could have conducted their investigation in twelve and ten minutes, respectively. *Id.* at 2-3; see also ECF 38-1 (Dimitris Spiliadis Affidavit), ¶¶ 8, 16 (opining that time estimates of Osgood and Martin are flawed). In addition, defendants take issue with the fact that Martin's Affidavit is signed by a notary from Prince George's County, Maryland, but the affidavit is certified "under the laws of the State of California[.]" ECF 35 at 2; *see* ECF 29-6 at 2; *see also* ECF 38-2 to ECF 38-7 (Affidavits). And, defendants complain that the Motion mentions "Beer 4 U Sports Bar," an entity that is not a party in this action. ECF 35 at 3 (citing ECF 29-3 at 11).

These contentions are red herrings. To preclude summary judgment, defendants must demonstrate that there are *genuine* disputes of *material* fact that preclude the award of summary judgment as a matter of law. *Ricci*, 557 U.S. at 586-85. Defendants' argument that the investigators could not have visited the establishments in the amount of time recorded in their affidavits is "merely a self-serving opinion that cannot, absent objective corroboration, defeat summary judgment." *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004); *accord Riley v. Honeywell Tech. Sols., Inc.*, 323 F. App'x 276, 277 n.2 (4th Cir. 2009) (noting that the plaintiff's "self-serving contentions" that he was treated unfairly "were properly discounted by the district court as having no viable evidentiary support"). And, the boilerplate in the affidavits is inapposite;

it has no bearing on the key issues in this case, *i.e.*, whether the Company held the rights to the Program, whether defendants licensed the Program, and whether they exhibited the Program. *See, e.g.*, *J&J Sports Prods., Inc. v. Sandoval & Sandoval, Inc.*, CBD-17-1392, 2018 WL 3727944, at *2 (D. Md. Aug. 3, 2018) (declining to find that a scrivener's error in the affidavit of a J&J investigator was material); *J&J Sports Prods., Inc. v. Rubio*, CV-16-01111-PHX-JJT, 2017 WL 3234939, at *4 (D. Ariz. July 31, 2017) (rejecting defendants' argument that discrepancies between investigators' affidavits precluded summary judgment).

Thus, I shall grant the Motion as to Count I against Dimitris as the trustee for the surviving assets of Blue Zone and Olive Grove.

### C. Individual Liability

As noted, J&J seeks to establish personal liability against Dimitris, Pauline, and Sotirios. When a plaintiff seeks to hold an individual officer or employer personally liable for a violation of 47 U.S.C. §§ 553 or 605, "courts have typically adopted the test for vicarious liability used in the context of copyright infringement." *Beer 4U*, 2019 WL 5864499, at *4 (citing *J&J Sports Prods., Inc. v. Mayrealll, LLC*, 849 F. Supp. 2d 586, 589 & n.5 (D. Md. 2012)). Under this test, "a plaintiff must prove that the individual had both a 'right or ability to supervise that coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials.'" *Beer 4U*, 2019 WL 5864499, at *4 (alterations in *Beer 4U*) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'n, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997)); *see also J&J Sports Prods., Inc. v. Ramsey*, 757 F. App'x 93, 95-96 (3d Cir. 2018) (collecting cases); *Brady*, 672 F. App'x at 801-02.

On the first prong of the vicarious liability test, J&J has not carried its burden of establishing that the individual defendants had the right or ability to supervise the establishments at 803 South Caroline Street. The Company asserts that Dimitris "was an officer" of Blue Zone

15

and Olive Grove. ECF 29-3 at 3 (citing to ECF 1-1 at 5). And, it contends that Dimitris appears to assume that he had supervisory authority because he was inside the establishment when the Program was broadcast. ECF 29-3 at 3 (citing ECF 29-7 at 8). Further, the Company asserts that Pauline and Sotirios are liable because they were partial owners of Olive Grove and held the liquor license to 803 South Caroline Street. ECF 29-3 at 3 (citing ECF 1-1 at 19; ECF 29-7 at 50, 58).

Although there is evidence that Dimitris was the registered agent of Blue Zone and Olive Grove, the record does not indicate that he was an officer of either entity. ECF 1-1 at 1-6. Nor is it self-evident that possessing a liquor license conferred authority on the individual defendants to control what was broadcast at the establishments at 803 South Caroline Street. Indeed, in response to plaintiff's Request For Admissions, the individual defendants maintained: "The INN owned by Jack Dwyer paid Direct TV for a commercial viewing in its three venues for the event." ECF 29-7 at 6, 15, 24. And, they each denied that they were the owner or manager of the establishments at 803 South Caroline Street. *Id.* at 7-8, 16, 25. Thus, there is a genuine dispute as to whether defendants had supervisory authority over the establishments at 803 South Caroline Street.

Moreover, it is not clear that the individual defendants had a direct financial interest in the Program's unlawful broadcast. Judge Chuang recently addressed the second prong of the vicarious liability test in *J&J Sports Prods., Inc. v. Beer 4U, Inc.*, TDC-18-2602, 2019 WL 5864499 (D. Md. Nov. 8, 2019). There, he observed that "[s]ome courts have deemed an individual's admission of requisite control over the corporate defendant sufficient to satisfy this standard." *Id.* at *5 (citing *Sandoval & Sandoval*, 2018 WL 3727944, at *3; *Zuffa, LLC v. Trappey*, No. 11-0006, 2012 WL 1014690, at *5 (W.D. La. Mar. 22, 2012)). But, as Judge Chuang noted, "[o]ther courts have looked to evidence beyond the ownership interest and required plaintiffs to show that the individual defendant sought or received financial benefits, directly or indirectly, from the pirated

broadcast." *Id.* (citing *Brady*, 672 F. App'x at 802; *J&J Sports Prods., Inc. v. Ahuachapan Corp.*, 17-CV-01184 (LDH) (PK), 2019 WL 1274693, at \*3 (E.D.N.Y. Mar. 20, 2019); *Rubio*, 2017 WL 3234939, at \*4). Indicia of a financial benefit includes "advertising that the unauthorized program would be shown at the establishment; collecting a cover charge on the night of the event; whether the unlawful broadcast was a draw for customers; and whether the establishment hosted a large number of patrons purchasing food or drink during the event, thereby contributing to the defendant's profits." *Id.*

Judge Chuang determined that the fight was broadcast "not by the manager or employees of the Sports Bar, but by an unauthorized patron, who projected the broadcast for a very short period of time onto a wall inside the Sports Bar, without [the defendant's] knowledge or authorization." *Id.* And, he found that there was conflicting evidence that a cover charge was collected because one investigator stated that he paid nothing, another investigator asserted that she paid $10.00, and the defendant denied that any cover charge was imposed. *Id.* \*6. Given these disputes, Judge Chuang concluded that "the record [wa]s insufficient to draw the conclusion that [the defendant] had a direct financial interest in the Fight's unlawful broadcast." *Id.* \*5.

The same is true here. As noted, Dimitris, Pauline, and Sotirios contend that Jack Dwyer owned the particular establishments where the Program was exhibited. *See id.* at 7-8, 16, 25-26. And, they deny having financially benefited from the Program's broadcast. *See id.* at 8, 17, 26. However, plaintiff does not address these averments anywhere in its submissions. Therefore, there are genuine issues of material fact as to whether Dimitris, Pauline, and Sotirios received any direct financial benefit from the unauthorized broadcast of the Program.

Accordingly, I shall deny the Motion as to Count I against Pauline, Sotirios, and Dimitris in his individual capacity.

## IV. Conclusion

For the foregoing reasons, I shall GRANT the Motion (ECF 29) in part and DENY it in part.

An Order follows, consistent with this Memorandum Opinion.

Date: January 29, 2020  _____/s/_____
Ellen L. Hollander
United States District Judge